Good morning, Your Honors, and may it please the Court. My name is Isabel Marin, and I am here on behalf of Petitioner Mr. Francisco Lopez-Bartolo, and I would also like to introduce his mother, Isabel Bartolo, and his brother, Heriberto Lopez, who are here today. Are they in the audience? Yes, Your Honor. Okay, because usually we don't have people in the well. Are the people that are sitting on your side lawyers? Yes. Okay, thank you. I would like to reserve three minutes for rebuttal. The agency in this case made a host of legal errors, but I would like to begin by addressing two of them. The first is that the asylum and withholding of removal statutes require the agency to make two separate findings before denying relief. First, that the noncitizen committed a particularly serious crime, and second, that the noncitizen constitutes a danger to the community, that is, currently. Can I ask you a question? You argue that Mr. Lopez-Bartolo is completely rehabilitated, so he's not going to be a danger to the community, and then you also argue that he's going to have behavioral problems in a mental institution in Mexico, so he's going to be subject to ECT. Don't you think those are intention? If he's fully rehabilitated, why would he need any behavior modification if he is institutionalized in Mexico? Your Honor, our position is not inconsistent. First of all, there has not been a finding on, you know, constitutes a danger to the community, so we haven't presented specific evidence and arguments onto that issue. And second of all, there's a key difference between Mr. Lopez-Bartolo's— But you are contending that he's fully rehabilitated, right? And that's why it was error not to consider that he's no longer a danger, right? We think he does not constitute a danger to the community currently, mostly because of his disability, his extreme disability due to his mental illness. And there's a key difference between his situation in Mexico and here, which is the family support, and family support would be able to give him the treatment that he needs. But in Mexico, without treatment, then, you know, that presents a different situation where he may come into the attention—well, he would come into the attention of the authorities. Okay. So, let me just factually get this straight. He was convicted of manslaughter and a gang enhancement and got 13 years, right? Yes. Right. He pled no other contender. He pled guilty. He was charged with murder, and the murder charge was dismissed, and he took a plea bargain. And it looks to me like the judge, having been a former trial judge, it looks to me like he got the low end on the manslaughter charge. It's because it's a California conviction? Yes. Okay. So, I think that's the low end of the voluntary manslaughter, but he had the mandatory 10-year gang enhancement. And so, he got 13 years, which you can—in California, usually there's on—if it's a determinate sentence, you have the low, the middle, and the high. So, that—I can't—I'm not so great that I can recall, but I think it's something probably like 3, 6, and 10. So, he could have gotten more time than he got, but anyway, he got 13 years. He took it. So, now, and he averted having a life sentence over his head, because murder, under any circumstances, if he were convicted of it, would be a life sentence, and then—and if he had the gang enhancement. So, he minimized his exposure. But are you contesting that this is a particularly serious felony—crime? Yes, Your Honor. We are. You say that this—his manslaughter is not? No, because the agency has to consider his mental health at the time, and that would—if they had considered that evidence, the agency, we think, would properly find that it's not a particularly serious crime. And we would like to emphasize the low end of the sentence that Your Honor pointed out of 3 years, and we don't think it's appropriate to consider the mandatory length of 10 years. And you don't think his criminal defense lawyer would have pursued a not guilty by reason of insanity or any kind of mental illness defense if that were, in fact, true at the time? Well, Your Honor, under the Gomez-Sanchez case, this Court points out that there are circumstances where mental health evidence is not available during the time of the criminal conviction versus now having more of that evidence. So it doesn't undermine, you know, the criminal conviction in any way, and it's not dispositive that that was not presented at the time of the conviction. I'm only speaking for myself here, but you're going to have an uphill battle convincing me that this isn't a particularly serious crime. But the other avenue that I understand you're asking us to take, and it's gotten a bit—we asked you all to do supplemental briefing on Loper, right? Yes, Your Honor. Okay. So generally, the particularly serious crime involves a Francesco analysis, but there's also a Ninth Circuit case where it's said that you don't have to make the dangerousness. If you find the particularly serious crime, that's the end of it. But your argument is because included in that, if I understand it correctly, there was some Chevron deference that we should not follow our own precedent and then say that even though it is Ninth Circuit precedent, we should not follow that. We should say that that wasn't well-reasoned. And even though Loper said that it's not open-ended, you get to go back and revisit every case where Chevron deference was involved. I struggle with how I would revisit that precedent that we have on the Ninth Circuit. And I honestly think, too, and I just kind of thought about this this morning, but it's not—I'm on a case that has precedent over this that involves a similar issue. It's called Lopez v. Garland, it's 23-870, where we heard argument, it was submitted on May 17th, which ultimately might give some guidance on what a court does with Loper. I think it was argued before. The case was Judge Sanchez, Judge Callahan, and Judge Sidney Thomas, but that's not going to—we're not—we don't have—we don't know that, but it would have precedence over this. So when we can revisit with—on Loper, if that case would be a published case, then that could possibly add something into the mix here. Well, thank you for giving me the opportunity to address that. So we do—Loper-Bright, we think, does not mandate that this Court always go en banc to deal with any situation where the previous case relied on Chevron, and we are advocating that there's only a very narrow set of cases where a panel could revisit a previous panel decision. And Ramirez-Ramos falls into that narrow set of cases, not only because the reasoning was very short, it did not engage in the traditional tools of statutory interpretation, and it upheld an agency decision that had—where the agency had already changed positions, which is a good indication that the Court understood that it was not looking for the best interpretation of the statute. How do you address the government's point that Congress has amended this portion of the immigration laws three times and has not—you know, knowing that the BIA didn't require a finding of present dangerousness and didn't correct that? Yes, Your Honor. So the provisions at issue here were enacted in 1980, and they come—they use the same language in the—from the 1967 protocol that adopts the 1951 Convention on Refugees. And so we would posit that the old soil is better—that, you know, where this interpretation came from, the old soil is better understood through the plain text of the statute, which is in present tense, the intent of the countries agreeing to the treaty, which you do look at text there, but you can also look to the context of the treaty. And so that would have been the old soil. And in Delgado v. Holder, there's a—the majority footnote, note 17, and the concurrence footnote, note 2, point to evidence, the U.N. High Commissioner's amicus brief, which they have long and consistently taken the position that there's two—two requirements here, including dangerousness requirement, and a—and another document, Paul Weiss' document that has the negotiations that occurred during the 1951 treaty that also indicate that there's two separate findings, that that would have been the proper old soil. But, you know, let me go back, because the only evidence of his psychiatric condition is an evaluation dated April 2022, which is long after his manslaughter. And there was only speculation about his mental health issue at the time of that crime. So can—let me ask a separate question. You argue that a—any kind of restraint to modify behavior would also constitute torture. And that seems like a really extreme position if an institutionalized person is acting violently. So what is your—how could that be torture? And you're saying in all instances, if they use a cloth—a cloth band to restrain wrists, that's torture? Well, Your Honor, if this Court is more comfortable only looking at the electroconvulsive therapy, then that is fine. There is—there is evidence that, you know, this is not just a bandage restraint. This is also chemical restraints we're at issue here, over sedation. And there is evidence— But you argue any restraints constitute torture in your briefs. Are you now withdrawing that position? No, I'm not withdrawing. But one has to remember first that the way that they're using the restraints has to rise to the level of severe pain that constitutes torture under CAT. So we're talking about a very, you know, extreme form of— Don't we do some of those things here in this country, too? Isn't—aren't there medically—doesn't that happen sometimes? Well, the facts here— I mean, obviously, I get the torture thing if you just pull people off the street and start, you know, giving all of us electroshock there, you know, just hitting us all up with— But on the other hand, if you have people that are violent, if you have people that have—I think they even use some of these treatments for people that have Parkinson's or any number of things, but— The key finding, though, is why—I mean, we're not saying that any use of ECT ever is inappropriate. There are some instances where it's an appropriate medical treatment, but the purpose has to be to treat the person. Here that's not the purpose. The record is very clear. The IJ's fact-finding are very clear. This is for coercion. This is for unruly patients. This is to control their behavior, to make them do what the government wants. It is not for medical treatment. In fact, our expert, which got full weight from the IJ, said multiple times, this is for behavior modification or punishment to control unruly patients, and that then another instance— Well, sort of when you have—when you've already committed a manslaughter, let's say, you've taken a life, okay, let's—without going into the circumstances, and you've taken it against what our laws are, and then you have evidence of, you know, extreme mental health issues, that puts him in a category that is pretty frightening in terms of dangerousness. But then he's arguing, on the other hand, he's not dangerous, and he's—so it's hard to sort of figure all that out. I'm also conscious of my time, and I do still want to save my time for rebuttal, but to address your question. What was your—how much time did you want for rebuttal? Three minutes, Your Honor. Okay. And you can go ahead and answer, and I'll give you three minutes. How's that? Thank you, Your Honor. Yes, well, he—because of his mental illness, he is extremely disabled right now, and here he has family support that could help him deal with that. The fact that— I didn't get that he was living with family right now. He's not—no one—he's not living with anyone. No, he's detained right now. Right. Okay. But that is a key difference in terms of what—how his circumstances in Mexico versus what his circumstances would be here, and I also want to reiterate there has not been fact-finding on this issue before the agency.  Let me ask a— Go ahead, Judge. Let me ask a different question. If we agree that the district court should make a separate finding on dangerousness, okay, are there any cases that tell us as of when that finding should be made? In other words, is it dangerous at the time of that prior offense or some other time? No. Is there any case law on that? Well, Your Honor, it would be current dangerousness, and I get that—  Well, why isn't—why isn't—why is it not in connection with the crime that was found to be, you know, serious? Well, to two reasons, Your Honor. So, first, if one looks at the text, there's present tense. If you look at the intent of the nations that agreed to the treaty language, it's about weighing when is this person such a danger currently to the community that you would deliver them into the hands of those who would persecute them. That's a very serious—this is a very narrow exception, and so that's why it has to be current dangerousness because it's— So, even if there had been a dangerousness finding back at the time, you would say you get to update it for now. Is that my—is that your argument? It would be as of the date of the fact-finding. Even if the court—even if the finding had been made it's a particularly serious crime and he's dangerous previously, then—so you don't have the argument that both of those findings weren't made, but you'd still say at any given time it's got to be revisited. Maybe not at any given time, but when the IJ is making their fact-finding, then it would be at that moment. It's—yes, Your Honor. Okay. I'll give you three minutes for rebuttal. Thank you. Good morning. Good morning, Your Honors. May it please the Court? Jeffrey Hartman, appearing for the Attorney General. The Board's particularly serious crime determination in this case was not an abusive discretion. Can you kind of, like, slow it down a little bit?  I'm sorry. Yeah. The Board properly applied the matter of NAM factors in determining that the voluntary manslaughter conviction in this case was particularly serious. Obviously, the crime resulted in a death. As Judge Cowan, you were pointing out, the sentence was enhanced with this mandatory death. Well, okay. So what are we revisiting here? They are not—I wasn't totally clear on this, but apparently they're not conceding that it's a particularly serious crime. They're saying it wasn't. And so what do we look at for that? Because at some point, the Francescu factors were looked at, and then we would review that for what? And then we have the—is it Ramirez—what is it—Ramos? Yeah. Ramirez-Ramos. Ramirez-Ramos, which basically says that you don't have to make the—that when you find a particularly serious crime, that includes that the person is dangerous. It's not a separate finding. And I think Judge Coe pointed out that Congress has made several amendments and never taken that particular one on. So, you know, putting our analysis on, there's—and then we have Loper, so we have all of those layers of everything. Yes, Your Honor. Let me start with Loper and the supplemental briefing. Our position is that Loper-Bright does not require courts to revisit cases that relied on the Chevron doctrine and interpreting statutes. There needs to be a special justification to revisit a judicial precedent that interprets a statute. So, are you saying we can never revisit? No, Your Honor. It just needs to be a special justification. Okay. And the things that the Supreme Court has looked at in cases like Patterson is whether the precedent has proven unworkable or there's disagreement among the authorities. And here, there's no disagreement. The board in Matter of Carball in 1986 established that there is no separate present or future dangerousness analysis, that the analysis is focused on the three Matter Francesco factors. As Judge Koh pointed out, Congress has had three opportunities and has changed other aspects of the particularly serious crime statute, but it's never changed that old soil. And I take my friend's point— So, your point would be if we did revisit Carballis, we would be a three-judge panel revisiting a three-judge panel, and we don't have the special circumstances, so it would have to be an en banc cleanup to do what your friend on the other side is asking us to do. Is that your position? I think that's right, Your Honor. I think under Loper-Bright, the court should adhere to its prior precedents. The statute contains a delegation to the Attorney General to decide if a particular offense is particularly serious. And then, you know, even if the court sat en banc and revisited the statute, Ramirez-Ramos had the correct interpretation. The court used tools of statutory construction. It looked at the phrasing of the particularly serious crime statute, and— But under Miller v. Gammey, if it's clear to us, right, that that rule is inconsistent with Loper-Bright, don't we have the obligation to go ahead as a three-judge panel and rule on it? And so I think the way Judge Tashima reconciled those cases is that Loper-Bright expressed the contemplates that courts don't need to revisit cases that relied on Chevron. I think that's the way to reconcile this Court's clearly reconcilable case law in Miller v. Gammey with the way to deal with the fallout of cases that applied the Chevron doctrine in interpreting statutes. And so we would request that the court adhere to its precedent, defer to the Attorney General's interpretation of that. But Loper gives us a little crack to go back, if we want to, I think, what Judge Tashima is saying. But we would have to decide if it fit. But Loper also says it doesn't mean everything that happened before, where there's Chevron deference, is — should be upended. That's right, Your Honor. I think Judge Kagan's opinion and Kimball's goes to this point, Petitioner seeking to overrule a statutory precedent bears a special burden because judicial interpretations of the statute become part of the statutory scheme. And as Judge Cote pointed out, Congress had three opportunities to change this analysis if it thought the Board got this wrong, and it hasn't done so. And so we'd ask the Court — But how do you address the Petitioner's argument that you would render, you know, is a present danger superfluous? If you say the Attorney General can decide what is a particularly dangerous crime, and that somehow encompasses whether they present a current danger, that — why do we have that language in the statute, anyway, if it's not a separate requirement? So in Ramirez-Ramos, the phrase that's having been committed or been convicted of a particularly serious crime is a danger to the community of the United States, and so danger to the community of the United States is inexorably linked with the having been committed of a particularly serious crime, as this Court explained in Ramirez-Ramos. But there's no comma. There's no comma. Having been convicted of a, you know, particularly serious crime, comma, is a present danger. There's no comma there. It's sort of one sort of fluid statement. I take Your Honor's point. I think difficult to be too critical of Congress in this circumstance because the language comes directly from Article 33 of the protocol, and so Congress implemented the protocol. And it gets its meaning — this Court explained that Congress didn't define any of the terms in the particularly serious crime statute. That's in Mahaney, which is cited in Ramirez-Ramos. And so the meaning that the Board gave to that phrase in matter of carball has informed, you know, what it means to be a particularly serious crime, and Congress has never changed that. And the analysis in Ramirez-Ramos is that Congress would have used a conjunction like and in place of is if it had intended for there to be a separate dangerousness analysis. And despite that guidepost from this Court, Congress hasn't taken that opportunity to change the statute in the way that courts have described it would need to be amended in order to encompass a present danger analysis. So your friend on the other side wants, I think, to always evaluate someone in the present tense. And so I think the — if I understand your interpretation, and I'm not agreeing or disagreeing with anyone, it would basically — it would be over when the particularly serious felony — particularly serious crime analysis, which would encompass, is a danger. It would be over at that point, and so people would not be able to come back and say, well, I don't know, now I'm in a coma, and I can't be particularly — I can't be dangerous, or any — they could always update it. So I'd take your Honor's point — I mean, I think they want to say right now he's in a condition where he can't hurt anyone. I take the point. It is a discretionary analysis, so in an extreme case, your Honor, the IJ or the board might not apply the bar. And I guess that's my best response to that, in an extreme case where the agency, as a matter of discretion, decided not to apply the statutory bar to asylum and withholding — The agency could do that, but it would be the agency, not us. Correct, your Honor. And here we have the finding that the conviction was particularly serious. The board did consider the mental health evidence in this case. Dr. Marbury explained that the symptoms in this case began in 2020, that there was no prior history of mental health problems in the community. His sister testified that the symptoms began three years before her November 2022 testimony. His mother sent a letter to the IJ that the symptoms began around the same time. And so there's no evidence at the time of this offense that Mr. Bartolo was suffering, or that his conviction was the direct result of a mental health problem, which is what this Court requires under Benedicto. Can you talk about torture and the electrotherapy? Yes, your Honor. So the board correctly reviewed this determination. The IJ made a specific finding — shouldn't use specific — the IJ made a finding that there was no specific intention of Mexican mental health officials to torture Mr. Bartolo. And then, finding no clear error in that determination, the board explained, consistent with the Court's cases like Villegas and Acevedo, that in the absence of a specific intent to inflict severe pain and suffering, that Mr. Bartolo had not met his burden of demonstrating torture. And Dr. Foster, who was an anthropologist, she conducted field research in 2008 for an entire year at this 160-person bed hospital, described two instances of ECT. But they're extreme cases. One of the patients who was refusing food — this is at AR 334 — was under the delusion that her sister and the staff were colluding to steal her organs, and that's why she wasn't eating food. And so ECT was administered as a procedure, you know, to treat the underlying condition that was preventing her from eating food. Joshi makes the same point, and this Court and Acevedo, that the administration of this type of medical procedure is not torture unless it's specifically intended to cause severe pain and suffering on the victim. And the immigration judge, in deciding that there wasn't that specific intent, didn't look just at Dr. Foster's testimony, but also looked at the 2022 reforms that Mexico had implemented to shift towards a community model, considered, you know, the pension that's available to people with disabilities. And so the immigration judge's specific intent finding is holistic. It looked at the entire record, and Dr. Foster was asked very specifically at AR 226 and 227 about the purpose of the ECT, and she said, I very much hesitate to say that there was a specific intent to inflict harm. And so on that record, it was entirely reasonable for the immigration judge to conclude that there wasn't a specific intent to inflict severe pain and suffering on individuals with serious mental health conditions in Mexico. But how does ECT work? How does it actually modify the behavior without causing pain? So the Fourth Circuit's opinion, Joshi describes the procedure, I think, best on this record. It's the administration of a low-voltage electrical current through the brain under anesthesia to induce a seizure, and it modifies, mitigates the underlying condition, Your Honor. Was there any evidence in the record that the Mexican institutions were not using anesthesia when they used the ECT procedure? No, and I don't think it's an issue that's squarely presented here because the agency assumes that Mr. Bartala would be in a Mexican mental health institution and that this was one of the procedures that could potentially apply to him. The IJ was focused on the specific intent issue, what motivated the application of this type of procedure, and the mere fact that it's ECT isn't sufficient to establish torture. Acevedo was a case that dealt with the application of ECT in the Salvadoran National Hospital. And in that case, there was no anesthesia administered. And the court concluded that no record evidence compelled a specific intent finding. We cite, at page 45 of our brief, the Penaloza case, which dealt with restraints and lobotomies there again. If Dr. Foster was at one institution in Mexico for a year, you said there were two instances of usage of ECT. What was the other one? One was, you know, infusing food and... The other was where the patient believed that they were the governor of the state. And I think Dr. Foster, with respect to that patient, said that the symptoms didn't remit quickly enough, and I think that was the reason for the application of ECT. And what exactly were her words? She hesitated to say that there was a specific intent to inflict harm, or what were her exact words? It said, 226, I very much hesitate to say that there's a purposeful intention of harm by an individual. I'm happy to answer additional questions about the particularly serious crime. I don't have any additional questions. Judge Tashima, did you have any additional questions? We don't. Thank you very much, Your Honors. We'd ask that the court deny the petition. All right. Thank you. Your Honor, there is evidence that ECT is used without anesthesia. It's AR-493, Disability Rights International Report. Also, that a patient was punished after a dispute with an official at the hospital, used 11 ECT sessions as punishment, and only stopped when the patient seemed on brink of death. Do you agree that this specific intent to inflict severe pain or suffering is a question of fact? So if the debate amongst the parties is whether on the facts there is a certain intent, what that intent is is a question of fact, but the ultimate determination about whether that intent, what's happening, qualifies as specific intent, that's a legal question. So how do you address if Mr. Lopez-Bartolo's own expert, Dr. Foster, hesitated to say that there was intent to inflict severe pain and suffering? How do you address that? That was your own expert and your own evidence that you put in the record. The experts said multiple times, this is not for medical treatment. This is for behavior modification or punishment. So another AR-226 to 227. When a patient is not doing X and I want him to do X, then I order this treatment because it makes the patient do it, right? And that is not treatment. The legal position of the government here is basically that specific intent requires a single intent to cause pain, but and therefore you can point to any ultimate purpose, including a prescribed purpose like behavior modification, which is just coercion, making a patient do what they, what the government wants them to do, that that somehow nullifies specific intent. There's no debate that this causes severe pain or suffering, that it rises to the suffering under CAT. And so the only question is whether you can knock out specific intent by pointing to an ultimate ulterior motive. I would also like to address your question, Judge Koh, on old soil. I did not finish my answer on that. There's no old soil because the agency flip-flopped its meaning before the three amendments that the government points to. There were no uniform interpretations in the court, in the circuit courts or supreme court. Most of those cases held that the statute was ambiguous. So if Congress was ratifying anything with their silence, it was that the agency could change its mind, that it's ambiguous, that obviously that framework doesn't work now under Loper-Bright. But there's no old soil. There was no clearly established meaning at the time. So that argument simply does not work. The government- Congress have overruled Cabalis? Carbalis or Cabalis or whatever? Well, Congress did not act. That is generally poor evidence, post-enactment. But they could have, right? They could. They could have. But what the courts held when looking at Carbalis is, for the most part, just that the statute was ambiguous. So, again, what they would be deferring to, and they also would know that the agency had changed its mind. So we just think that all that small sliver of non-post-enactment, non-action by Congress is completely outweighed by the text, the intent of the parties, and the common sense that, you know, there are instances of rehabilitation. There are instances where the crime is committed as a minor. Decades later, this person has reformed.  If we don't have additional questions, I've allowed you extra time. So take 30 seconds and wind up.  Well, the government conceded that in an extreme case, it would make sense to consider current dangerousness. And like I was saying, that makes a lot of sense, given potential fact patterns in many cases and also in this one. And the statute can't have one requirement sometimes and two requirements the other time, as the government sees fit at the time. So we would urge the Court to grant the petition and remand. All right. Thank you both for your argument in this matter. It was very helpful. And once again, thank you for doing pro bono work. We sincerely, as a Court, appreciate — we appreciate everyone that comes before us, but we do appreciate pro bono work because they're generally difficult issues. And without the assistance of good lawyers on both sides, it makes it more difficult for us to decide the cases. So thank you very much. This Court will stand in recess for the week. Okay. All rise.
judges: TASHIMA, CALLAHAN, KOH